# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

BELINDA E. CUNNINGHAM                                                                    PLAINTIFF

v.                                           CIVIL ACTION NO. 1:15-cv-00379-LG-MTP

CAROLYN W. COLVIN                                                                    DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff Belinda E. Cunningham brings this action pursuant to 42 U.S.C. § 405(g) and

1383(c)(3) seeking judicial review of a final decision of the Commissioner of the Social Security

Administration denying her claim for social security disability benefits. This matter is now

before the Court on the Motion for Summary Judgment [12] filed by the Plaintiff Belinda E.

Cunningham. Having carefully considered the pleadings, the record, and the applicable law, the

undersigned recommends that the Motion for Summary Judgment [12] be DENIED and that this

case be DISMISSED WITH PREJUDICE.

## PROCEDURAL HISTORY

On October 10, 2012, Plaintiff Belinda E. Cunningham filed an application for

Supplemental Security Income benefits, alleging disability due to bipolar disorder, back

problems, migraines, thyroid problems, tremors, anxiety, and MRSA[1] with an onset date of

October 10, 2005. (Administrative Record [11] at 24, 147, 176.) This application was denied

initially and upon reconsideration. ([11] at 97, 103.) Thereafter, Plaintiff requested a hearing

---

[1] "Methicillin-resistant Staphylococcus aureus (MRSA) is a bacterium that causes infections in different parts of the body. It's tougher to treat than most strains of staphylococcus aureus -- or staph -- because it's resistant to some commonly used antibiotics." *See* http://www.webmd.com/skin-problems-and-treatments/understanding-mrsa#1(last visited Aug. 22, 2016).

before an Administrative Law Judge ("ALJ"), and on April 2, 2014, ALJ Sandra DiMaggio Wallis held a hearing which included the Plaintiff, her counsel and Robert E. Walker, a vocational expert ("VE"). ([11] at 41-66, 134.)

On May 16, 2014, the ALJ found that the Plaintiff was not disabled and denied her claim for benefits. ([11] at 21-31.) Plaintiff then appealed this decision submitting additional evidence. ([11] at 9.) The Appeals Council denied Plaintiff's request for review on September 11, 2015, rendering the ALJ's decision the final decision of the Commissioner. ([11] at 5.)

Plaintiff filed her Complaint [1] on November 12, 2014, requesting an order from this Court reversing the Commissioner's final decision and directing the Commissioner to award benefits to the Plaintiff, or in the alternative, remand the case for rehearing. Plaintiff also requests the Court to award her attorney's fees and the costs and fees of this action. The Commissioner answered the Complaint, denying that Plaintiff is entitled to any relief. *See* Answer [10]. The Plaintiff then filed a Motion for Summary Judgment [12]. The parties having briefed the issues in this matter pursuant to the Court's Scheduling Order [3], the matter is now ripe for disposition.

## MEDICAL/FACTUAL HISTORY

Plaintiff was twenty-eight years old at the time of her alleged disability onset date. ([11] at 172.) The medical records indicate that Plaintiff underwent a lumbosacral discectomy nine or ten years ago. Her doctor's notes indicate that she did fairly well following this surgery. ([11] at 672.) On January 13, 2012, Chelsea Grow, D.O. treated Plaintiff at Memorial Physician Clinics for unsteadiness, falls, tremors in the right arm, postural tremor, and seizures. Dr. Grow also noted that Plaintiff's upper and lower extremity strength and her range of motion were normal.

2

([11] at 442-48.) Plaintiff described her seizures as generalized motor seizures made worse by fatigue, stress, and lack of sleep, but stated they were made better with anticonvulsant medications. ([11] at 442-48.) Plaintiff also described that she experienced headaches exacerbated by noise, light, and stress, but that non-opioid analgesics relieved them. ([11] at 442-48.) Plaintiff was also experiencing symptoms resulting from bipolar disorder including insomnia, flight of ideas, hyperactivity, sleep disturbance, and fatigue. ([11] at 442-48.) Plaintiff indicated to Dr. Grow that she had recent recurring falls and impaired balance. ([11] at 442-48.) Dr. Grow also noted a tremor. ([11] at 442-48.) Dr. Grow found lower extremity ataxia present, her gait wide-based and ataxic, and her balance impaired. ([11] at 445.) Dr. Grow noted the Plaintiff's medical history included: bipolar disorder; history of headaches; history of seizure disorder; idiopathic insomnia; conversion disorder with seizures; and involuntary shaking or trembling movements. ([11] at 442-48.) For the conversion disorder with seizures, Dr. Grow planned an EEG and MRI of the brain. ([11] at 442-48.) Plaintiff's medications on that date were Ambien, Dilantin, Flexeril, Imitrex, Lamictal, Lortab, Topamax, Tylenol, and Valium. ([11] at 443.)

At the February 13, 2012, follow-up appointment, the MRI showed a 2mm small white spot on the right temporal lobe. ([11] at 446.) It was also noted that the EEG[2] was normal and "no spells or seizures" had occurred since the last visit. Additionally, Dr. Grow noted that Plaintiff had gait ataxia only intermittently. ([11] at 446.) Dr. Grow indicated that the types of

---

[2] "An electroencephalogram (EEG) is a noninvasive test that records electrical patterns in your brain. The test is used to help diagnose conditions such as seizures, epilepsy, head injuries, dizziness, headaches, brain tumors and sleeping problems. It can also be used to confirm brain death." *See* http://www.mayfieldclinic.com/PE-EEG.htm (last visited Aug. 22, 2016).

lesions seen in Plaintiff's brain have been seen in people with migraines, but it did not explain the seizures or gait. ([11] at 449-50.)

In July of 2012, Plaintiff once again saw Dr. Grow reporting similar symptoms as her previous visits.  Dr. Grow made similar examination findings to those she made in the previous visits and prescribed lamotrigine and phenytoin for the conversion disorder with seizures. ([11] at 456.)

In October 2012, Plaintiff once again visited Dr. Grow for a follow up visit. At the visit Plaintiff complained of "new onset low back pain radiating to the right leg posterior thigh and calf." ([11] at 457.) Plaintiff also indicated she had frequent falls. ([11] at 457.) At this visit, Dr. Grow indicated that the Plaintiff's range of motion, stability, and muscle strength and tone were normal. ([11] at 460.) An x-ray of the lumbar spine showed disc space narrowing at the L5-S1 consistent with degenerative disc disease. ([11] at 457.) Dr. Grow also noted lumbar radiculopathy from Plaintiff's complaint of leg pain and indicated that Plaintiff had a pending MRI of the lumbar area. Dr. Grow reviewed Plaintiff's lumbar MRI later that week; it was noted there was straightening of the spine suggesting spasm and pain. ([11] at 464.)

Soon after, on October 17, Plaintiff went to the hospital for back pain and right leg pain and was treated by a Dr. Francavilla. Plaintiff indicated numbness in her foot and difficulty with bowel bladder function. ([11] at 490.) The next day, Dr. Francavilla performed a discectomy L5-S1 on the right side of the Plaintiff's back.[3] ([11] at 495.) A large fragment of a disk was

---

[3] "Posterior lumbar discectomy is a surgery to remove a herniated or degenerative disc in the lower spine." *See* http://www.mayfieldclinic.com/PE-LumDiscectomy.htm (last visited Aug. 22, 2016).

removed, and the postoperative diagnosis was recurrent disk herniation. ([11] at 495.) "Epidural

exploration showed no further compression." ([11] at 495.)

On November 8, 2012, Plaintiff went back to the emergency room. She indicated that

after her surgery she was doing extremely well, but since two days ago she had low back pain

and a fever. ([11] at 511.) Plaintiff stayed in the hospital until November 27, 2012, when she was

discharged by Dr. Francavilla who noted Plaintiff's incision was infected with MRSA and

drained. During the hospital stay on November 11, 2012, Dr. Grow examined Plaintiff because

she possibly had a seizure. ([11] at 516.) The exam of the EEG revealed mild left frontotemporal

irregularity, and Dr. Grow recommended that Plaintiff continue her normal anticonvulsant

medicine. ([11] at 516.)

In January of 2013, Plaintiff saw Dr. Settipalli for her continued leg and back pain. ([11]

at 608.) He prescribed Lortab, and after Plaintiff's infection was completely controlled he

planned to perform injections. ([11] at 608.)

On January 21, 2013, Plaintiff was examined by Patsy Zakaras, Ph.D., for a

comprehensive mental status examination for purposes of assessing disability. ([11] at 552.)

Plaintiff reported trouble standing, preparing pre-cooked meals, and not driving due to seizures.

([11] at 553.) On mental status examination, Dr. Zakaras found Plaintiff's "hands were observed

to shake," and she "seemed somewhat anxious." ([11] at 553.) Dr. Zakaras observed that Plaintiff

"seems capable of performing routine, repetitive tasks. She seems capable of following and

understanding directions. She seems capable of responding to supervision and relating to others."

([11] at 554.) Zakaras also noted that "there is no reason to expect any major change in her

condition over the next twelve months." ([11] at 554.)

After her examination for benefits with Dr. Zakaras, Plaintiff went back to Dr. Settipalli for pain. She claimed her symptoms were worsening, and she also had severe right leg pain that radiated throughout her leg. ([11] at 655.)  Dr. Settipalli made similar findings about her back and legs as before and prescribed Lortab. ([11] at 657-58.)

After her examination with Dr. Zakaras, Plaintiff went back to Dr. Grow on July 1, 2013, reporting having six seizures per month, with two of the spells involving loss of consciousness and "whole body jerking." ([11] at 627.) Dr. Grow prescribed the same medicines to Plaintiff as before and refilled Valium due to anxiety and seizure disorder. ([11] at 631.)

On July 3, 2013, two days after the previous visit, Dr. Grow filled out a medical statement which indicated Plaintiff had seizures classified as petite mal, grand mal, and staring spells. ([11] at 612.) Dr. Grow noted Plaintiff's seizures were generalized, and that she had six per month, with Plaintiff's previous three seizures occurring between June 20, 2013, and June 29, 2013.  ([11] at 612.) Dr. Grow indicated that Plaintiff's seizures would likely disrupt the work of co-workers, and she would need more supervision than an unimpaired worker. ([11] at 614.)

On October 7, 2013, Plaintiff reported to Dr. Grow that she had seven seizures over the past three months, with one seizure that was prolonged and involved an aura/warning, loss of consciousness, bladder incontinence, and vomiting. ([11] at 622.) Dr. Grow refilled Plaintiff's seizure medications, planned to check her lamictal level, and prohibited driving. ([11] at 626.) On February 4, 2014, Plaintiff reported to Dr. Grow an atypical seizure that had a prolonged aura/warning and loss of consciousness. ([11] at 617.) Plaintiff estimated having two seizures per

week. ([11] at 617.) Dr. Grow planned to monitor seizure frequency, and continued Plaintiff on medications for seizures. ([11] at 621.)

On April 2, 2014, at the hearing before the ALJ, Plaintiff testified as to her personal experience with her ailments. ([11] at 49-60.) A vocational expert testified that someone with Plaintiff's age, education, work experience, and the ALJ's determined RFC, could perform her past work as a fast food worker. ([11] at 63-64.) In the alternative, the vocational expert testified such a person could perform work as a laundry sorter, light housekeeper, and dining room attendant. ([11] at 64.)

## **BURDEN OF PROOF**

In *Harrell v. Bowen*, the Fifth Circuit detailed the shifting burden of proof that applies to disability determinations: "An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act.  Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled.  In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  An individual who does not have a 'severe impairment' will not be found to be disabled.

3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed."

862 F.2d 471, 475 (5th Cir. 1988). The claimant bears the burden at the first four steps, but the burden thereafter shifts to the Commissioner at step five. Once the Commissioner makes the requisite showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart,* 415 F.3d 457, 461 (5th Cir. 2005). A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell,* 862 F.2d at 475 (citations omitted).

## ADMINISTRATIVE LAW JUDGE'S ANALYSIS

On May 16, 2014, the ALJ using the five-step sequential evaluation process applicable to adult disability claims found that the Plaintiff was not disabled and denied her claim for benefits. ([11] at 21-31.) The five-step process included the following analysis:

- At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged onset date. ([11] at 26.)

- At step two, the ALJ found the following impairments to be severe within the meaning of the Social Security Act: back disorder, conversion disorder with seizures, and migraines. ([11] at 26-28.)

8

- At step three, the ALJ concluded Plaintiff's severe impairments did not meet the requirements for presumptive disability under the listed impairments in the regulations. ([11] at 28-29.)

Next, the ALJ found Plaintiff's limitations were not credible to the extent alleged. ([11] at 29-33.) The ALJ determined Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following limitations: Plaintiff could lift/carry and push/pull 20 pounds occasionally and ten pounds frequently; could stand/walk for six hours throughout an eight-hour workday and sit for six hours throughout the workday; could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; and must avoid unprotected heights, commercial driving, and hazardous machinery. ([11] at 29.)

- At step four, the ALJ found Plaintiff could perform her past relevant work as a fast food worker, which is an unskilled, light job. ([11] at 33.)
- In the alternative, at step five, the ALJ relied upon vocational expert testimony to conclude Plaintiff could perform the jobs of laundry sorter, housekeeper, and dining room attendant. ([11] at 34.)

## APPEALS COUNCIL REVIEW

As outlined above, Plaintiff appealed the ALJ's decision and submitted additional evidence to the Appeals Council that was not before the ALJ.[4] The additional evidence consisted of a one page medical record, dated June 10, 2014, from Handcock Medical, noting that Plaintiff's neck was examined by Ronald Kellum.  ([11] at 8, 672.) Dr. Kellum identified "small

---

[4] 20 C.F.R. § 404.970(b) permits a claimant to submit new evidence to the Appeals Council.

subcentimeter nodes . . . in the neck. . . . [with] no other significant abnormalities identified."
([11] at 672.)

The Appeals Council noted the additional records submitted by the Plaintiff, but denied her request for review, stating:

> We have found no reason under our rules to review the Administrative Law Judge's decision. Therefore, we have denied your request for review . . . . In looking at your case, we considered the reasons you disagree with the decision and the additional evidence. . . . We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence of record. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

([11] at 5-6.)

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. *See* 42 U.S.C. § 405(g) *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983). To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Id.* at 164 (citations omitted). However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted).

10

Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990).   A court may not reweigh the evidence, try the issues *de novo,* or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).

## ANALYSIS

Plaintiff raises the following two assignments of error:

(1) First, that the residual functional capacity determination was unsupported by substantial evidence as the ALJ improperly rejected the opinion of treating physician Dr. Grow.

(2) Second, that the ALJ's limitation to light work was impermissibly based upon the ALJ's own lay opinion despite evidence of a significant back impairment.

(Plaintiff's Memorandum in Support of Summary Judgment [13].)

**Issue No. 1: Whether the ALJ erred in discounting the opinion of Dr. Grow when determining Plaintiff's residual functional capacity.**

Plaintiff argues that the RFC was unsupported by substantial evidence because the ALJ discounted the opinion of Dr. Grow, Plaintiff's treating physician, when making her findings. "[R]esidual functional capacity is the most [one] can still do despite … limitations. . . . . [R]esidual functional capacity [is] based on all the relevant evidence in [the] case record. 20

11

C.F.R. § 416.945(a)(1). The undersigned finds that the RFC was supported by substantial evidence.

Plaintiff contends that the ALJ erred when it discounted the opinion of Plaintiff's treating physician Dr. Grow. Plaintiff reported her seizure frequency at six per month – two with loss of consciousness – to Dr. Grow on July 1, 2013. ([11] at 627.) Two days later on July 3, 2013, Dr. Grow documented her opinion on a form provided to her that Plaintiff's seizures occurred six times per month and that Plaintiff experienced loss of consciousness during her seizures. ([11] at 612.) In the form, Dr. Grow stated that that Plaintiff needed to avoid heights, and that she could not operate a vehicle or power machines. Dr. Grow further stated that the seizures might cause Plaintiff to miss work more than three times per month, and indicated that Plaintiff would need at least one unscheduled break per week. Dr. Grow indicated that Plaintiff was incapable of even low-stress jobs. ([11] at 614-15.)

The ALJ when discussing the opinion of Dr. Grow stated that "[l]ittle weight is given to this opinion as it is based on the subjective reports of the claimant's frequency of seizures and is not consistent with the record as a whole. This opinion is also not consistent with the objective medical evidence in the file that fails to conform to the claimant's alleged frequency of seizures, as she has had no emergency room visits or emergent care visits in [the] file after her seizures." ([11] at 32.) The ALJ did not entirely discount the medical opinion of Dr. Grow, but gave it little weight.

Generally, more weight is given to opinions from treating sources, since those sources are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)…" 20 C.F.R. § 416.927(c)(2) However, treating physician

opinions are only given controlling weight if they are not inconsistent "with the other substantial evidence in [the] case record." The Fifth circuit has stated that "These opinions are not conclusive, and the ALJ must decide the claimant's status." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). Further, "when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Greenspan*, 38 F.3d at 237.

Plaintiff claims that by discounting Dr. Grow's opinion the ALJ violated the treating physician rule. Plaintiff argues that the ALJ should have considered each "of the [20 C.F.R.] § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). "Specifically, this regulation requires consideration of:

(1) the physician's length of treatment of the claimant,

(2) the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence of record,

(5) the consistency of the opinion with the record as a whole; and

(6) the specialization of the treating physician."

*Id* at. 456.

However this six step analysis is not required if there is "competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded

13

than another." *Id.* at 458; *see also Walker v. Barnhart*, 158 Fed.Appx. 534 (5th Cir.2005) (interpreting *Newton* as not requiring the six-step analysis in the face of competing first-hand medical evidence). "[T]o the extent that the ALJ's determination reflected a limited rejection of the opinions or medical records provided by [her] treating physician, [the Court] find[s] that rejection to be justified by the character of the records provided and to be supported by overwhelming medical evidence from other treating and reviewing physicians." *Shave v. Apfel*, 238 F.3d 592, 595 (5th Cir. 2001).

The ALJ here found that the opinion of Dr. Grow was unsupported by the evidence. In this case, there was evidence from Dr. Grow's own medical records and the medical records of other doctors indicating that the Plaintiff demonstrated few functional limitations. Dr. Grow's opinion is one of several physicians' opinions of record, but it is the only opinion assessing total disability. Two other physicians reviewed the Plaintiff' claim at the state agency, Glenda Scallorn, M.D., and Glenn James, M.D. ([11] at 32, 72, 82.)The ALJ gave these opinions "some weight" ([11] at 32.) Both of these reviewing doctors would have placed fewer limitations on the Plaintiff than the ALJ did, indicating that the ALJ took Dr. Grow's opinion into account, albeit at a lower level. The ALJ also gave "great weight" to Patsy Zakaras, Ph.D., who personally examined the Plaintiff. Dr. Zakaras concluded that Plaintiff could perform routine, repetitive tasks; follow and understand directions; respond to supervision; and related to others. ([11] at 554.) This opinion is consistent with the ALJ's findings. ([11] at 32-33.) Though not all of these doctors' opinions are treating physicians' opinions, their agreement that Plaintiff is not disabled, along with the treatment notes of serval treating doctors - including Dr. Grow's notes - creates substantial evidence that supports the ALJ's opinion.

14

Furthermore, even though Plaintiff did have seizures,  "[t]he mere presence of some impairment is not disabling per se. Plaintiff must show that she was so functionally impaired that she was precluded from engaging in any substantial gainful activity" *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). The ALJ considered Plaintiff's seizure disorder and her treatments but concluded the record did not establish total disability.

From January 2012 to February 2014, Dr. Grow after conducting physical exams noted a normal range of motion, normal muscle strength and tone, normal stability, and normal reflexes, but ataxic gait.[5] ([11] at 448-49, 453-54, 459-60, 464-65, 607-29.) Furthermore, relative to Plaintiffs seizures, Dr. Grow after examinations in her medical notes indicated that Plaintiff's orientation, memory, and attention were normal. ([11] at 31, 448-49, 453-54, 459-60, 464-65, 625-26.) In November of 2012, Dr. Grow noted that Plaintiff was "doing relatively well." ([11] at 519.) Furthermore, she stated she would not "change any of her anticonvulsants." ([11] at 519.) From January 2013 to March 2014, Dr. Settipalli treated plaintiff and observed that "she is a well-developed and nourished female, not in acute distress." ([11] at 598, 603, 636.) Dr. Settipalli also noted the Plaintiff's range of motion was except that the "flexon was painful" and "extension was restricted and painful." Additionally, Settipalli noted that the Plaintiff's "gait pattern is not antalaic[6].… [she] is able to ambulate on [her] heels and toes" ([11] at 598, 603, 607-08, 636-37, 640-42.) Furthermore, Settipalli also consistently noted no psychiatric

---

[5] "Ataxic gait an unsteady, uncoordinated walk, with a wide base and the feet thrown out, coming down first on the heel and then on the toes with a double tap." *See* http://medical-dictionary.thefreedictionary.com/ataxic+gait (last visited Aug. 22, 2016).

[6] Antalgic (painful) gait is when the patient attempts to avoid putting weight on one leg due to pain. "It is a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase." *See* http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited Aug. 22, 2016).

abnormalities. ([11] at 598-99, 602-03, 607-08, 625-26, 636- 37, 640-41, 645-46, 649-50, 653-54, 657-58.)

ALJs are required to "take into consideration all of the evidence from the treating doctors." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir.2001). The treatment notes from these doctors are evidence that the ALJ can and did take into consideration. *See* [11] at 30. The ALJ stated that "[a]fter evaluating the objective medical evidence in the record, it indicates that the claimant was more than capable of preforming work activity consistent with the above residual function capacity during her alleged period of disability. Specifically, the claimant's diagnostic tests, physical and mental exams, and her response to treatment strongly support the claimant's ability to do light work with environmental, postural, and mental limitations." ([11] at 30.) The RFC assessment is supported by substantial evidence in the record.

**Issue No. 2: Whether ALJ's limitation to light work was impermissibly based upon the ALJ's own lay opinion despite evidence of a significant back impairment.**

The Plaintiff also claims that the ALJ's finding that she was able to preform light work was impermissibly based on her lay opinion.  *See* [11] at 31. "In [*Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) the Fifth Circuit] held that an ALJ may not – without opinions from medical experts – derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own *unsupported* opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009)(emphasis added).

The record contains multiple opinions from physicians indicating she had normal function in her upper and lower extremities- which would include Plaintiff's back. ([11] at 30, 598-99, 602-03, 607-08, 625-26, 636-37, 640-41, 645-46, 649-50, 653-54, 657-58.)The record

16

also contains the two opinions from state agency physicians which were actually less limiting

than the ALJ's determination of light work.

Furthermore, the determination of residual functional capacity is the sole responsibility of

the ALJ. *Taylor v. Astrue*, 706 F.3d 600, 602–03 (5th Cir. 2012). "What [plaintiff] characterizes

as the ALJ substituting his opinion is actually the ALJ properly interpreting the medical evidence

to determine his capacity for work." *Id.* at 603. The ALJ was permitted to consider the totality of

the evidence, including the treatment notes, in assessing Plaintiff's RFC.

## CONCLUSIONS AND RECOMMENDATIONS

Based on the foregoing, the undersigned finds that the Commissioner's decision is

supported by substantial evidence and utilizes correct legal standards.  It is, therefore, the

recommendation of the undersigned that Plaintiff's Motion for Summary Judgment [12] be

DENIED, and that the case be DISMISSED WITH PREJUDICE and the denial of benefits be

affirmed.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules, any party within fourteen days after being served a copy of

this recommendation, may serve and file written objections to the recommendations, with a copy

to the Judge, the Magistrate Judge and the opposing party.  The District Judge at the time may

accept, reject, or modify in whole or part, the recommendations of the Magistrate Judge, or may

receive further evidence or recommit the matter to this court with instructions.  The parties are

hereby notified that failure to file written objections to the proposed findings, conclusions, and

recommendations contained within this report and recommendation within fourteen days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking

17

on appeal the proposed factual findings and legal conclusions accepted by the district court to

which the party has not objected.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29

(5th Cir. 1996).

THIS the 23rd day of August, 2016.

s/ Michael T. Parker
United States Magistrate

18